OREGON & C. R. CO. v. GRUBISSICH.†

(Circuit Court of Appeals, Ninth Circuit.   July 17, 1913.)

No. 2,181.

**1.** EVIDENCE (§ 352*)—CORPORATE BOOKS AND RECORDS.

While a corporation's books and records are evidence to prove its own acts, they are not competent evidence against third persons to prove contracts with them in the absence of proof that they knew and assented thereto.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1398–1403; Dec. Dig. § 352;* Corporations, Cent. Dig. § 1318.]

**2.** EVIDENCE (§ 208*)—PLEADINGS—ADMISSIONS.

The name of H. was affixed to the answer of defendant railroad company in a prior suit as president of the company, but he did not sign the verification thereto, nor did it appear whether he signed such answer or whether the attorney for the corporation did so for him.   Attached to the answer as an exhibit was a copy of the bill of sale by which H. transferred personal property to the railroad company.   There was nothing, however, to show that H. ever read the answer, or exhibit, or knew that his name was signed thereto.   *Held,* that, H. not being a party to the suit, the signing of his name to the answer under such circumstances did not constitute an admission against his interest, nor was it sufficient to raise the presumption that he knew of the existence of the instrument attached as an exhibit.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 713–725; Dec. Dig. § 208.*]

3   CORPORATIONS (§ 428*)—KNOWLEDGE OF OFFICERS.

Where the interests of officers or stockholders of a corporation are adverse to it, their knowledge of facts and circumstances affecting such interest will not be imputed to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. § 428.*]

4.   EJECTMENT (§ 95*)—CONVEYANCE OF PROPERTY—KNOWLEDGE.

In ejectment to recover certain property alleged to have been conveyed by H. to defendant corporation, evidence *held* insufficient to warrant a finding that H. ever conveyed the property or had knowledge of its conveyance.

[Ed. Note.—For other cases, see Ejectment, Cent. Dig. §§ 280–295; Dec. Dig. § 95.*]

**5.** EJECTMENT (§ 82*)—ISSUES, PROOF, AND VARIANCE.

Where, in ejectment to recover certain real property, defendant's claim of title was based entirely on a written bill of sale by H. to defendant, which plaintiff alleged should in equity be deemed either a deed or an agreement to make a deed, and prayed that the same be reformed and specifically enforced and that plaintiff be required to execute a good and sufficient deed, defendant could not sustain its claim to the property on the theory of a lost grant.

[Ed. Note.—For other cases, see Ejectment, Cent. Dig. §§ 222–228; Dec. Dig. § 82.*]

**6.** ADVERSE POSSESSION (§ 104*)—LOST GRANT—PRESUMPTION.

It is only where possession of land has been actual, open, and exclusive for the period prescribed in the statute of limitations to bar an action for the recovery of land that the presumption of a deed can be invoked,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

but it may be invoked where a proprietary right has been exercised beyond such statutory period, though the exclusive possession of the whole property to which the right is asserted may have occasionally been interrupted during such period, if in addition to the actual possession there have been acts of ownership.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

7. ADVERSE POSSESSION (§ 104*)—PRESUMPTION OF TITLE—STATUTES.

Under the statutes of Oregon providing that the presumption of title shall be based on 10 years' continuous adverse possession, mere silent possession, no matter how long continued, will not destroy the right of the true owner.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

8. ADVERSE POSSESSION (§ 104*)—LOST GRANT—PARTICULAR INSTRUMENT.

Where defendant's claim to land in controversy was based entirely on a certain instrument executed by H., the prior owner, defendant was not entitled to rely on the presumption of lost grant under the rule that, where the origin of the claim of title is known and is at variance with the supposition of a grant, there will be no presumption of lost grant.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

9. DEEDS (§ 26*)—VENDOR AND PURCHASER (§ 21*)—BILL OF SALE—CONSTRUCTION—TRANSFER OF REAL PROPERTY.

An instrument transferring property of H. to defendant railroad company, after enumerating all sawmills and machinery connected therewith, all tools, implements, apparatus, live stock, horses, cattle, drays, wagons, leases, and property of every name and kind owned by the grantors in the possession of H. & Co., provided that the same consisted of machinery, implements, railroad materials used by the grantors in construction of the railroad, and added that it was the intention to transfer to the railroad company all property, real and personal, of every name and nature owned or possessed by the grantors in the state of Oregon. The paper was executed as a bill of sale of personalty, was not stamped as a conveyance of real property, and was not recorded. *Held*, that such instrument could not operate as a deed, or a contract for the conveyance of land in Oregon belonging to the grantors to the railroad company.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 50–52; Dec. Dig. § 26;* Vendor and Purchaser, Cent. Dig. §§ 6, 25, 26, 89; Dec. Dig. § 21.*]

Ross, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Oregon; R. S. Bean, Judge.

Ejectment by Maria de Grubissich against the Oregon & California Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed.

The appellee herein had brought an action of ejectment to recover the possession of certain land in the state of Oregon, claiming title thereto as the devisee of her grandfather, Ben Holladay, who had died in 1887. The appellant herein, being the defendant in that action, brought the present suit to enjoin the prosecution of the action at law; it claiming to be the equitable owner of the property by virtue of an alleged unwitnessed and unacknowledged instrument of date March 28, 1870, which it alleged should be held in equity to be either a deed, or an agreement to convey, and praying that the instrument be reformed and specifically enforced, and that the appellee be required to convey said property to the appellant. The facts are as follows: On November 19, 1868, the then owners of the land in controversy executed,

to Ben Holladay & Co., a copartnership consisting of Ben Holladay, C. Temple Emmet, and S. G. Elliott, then engaged in constructing and equipping a railroad for the Oregon Central Railroad Company, a bill of sale of all the fir timber upon the land in controversy, with the right to erect a sawmill thereon. In the course of constructing the first 20 miles of the railroad, all the timber was cut and removed from the land, and thereupon the sawmill was also removed therefrom. While the timber was being removed, a portion of the land on May 4, 1869, and the remainder on October 5, 1869, was deeded to Ben Holladay & Co. The land has never been cleared or cultivated, but has remained in the condition in which it was when the timber was removed. In March, 1905, the land was inclosed by a fence constructed by the appellant for the purpose of initiating a title by adverse possession in the Oregon & California Land Company, a holding corporation for certain of the appellant's lands. From 1869 to 1872, the land was not listed for assessment. From 1873 to 1902, it was included in the corporation property assessed against the appellant, except that in the year 1880 it was assessed to Ben Holladay. From 1902 to 1910 it was assessed in the name of Ben Holladay & Co.

The alleged instrument under which the appellant claims title is as follows:

"Know all men by these presents: That we, the undersigned, Ben Holladay & Co., of Portland, Oregon, in consideration of the cancellation this date by the Oregon Central Railroad Company of Salem, Oregon, of all certain contracts in writing heretofore existing between said company and the undersigned, in relation to the construction of a railroad and telegraph line from Portland, Oregon, through the Willamette, Umpqua and Rogue River valleys to the California line, and the agreement of such company to pay the undersigned for all moneys paid out, expended and incurred under such contracts, to wit, an amount not less than eight hundred thousand dollars in United States gold coin. It being a part of the arrangement that all the property hereinafter specific should be transferred and delivered to said company, and in consideration of the full sum of one dollar to us in hand paid, the receipt whereof is hereby acknowledged, have sold, assigned, set over, transferred, delivered and conveyed, and by these presents we, Ben Holladay & Co., do sell, assign, transfer, set over, deliver and convey unto said Oregon Central Railroad Company, of Salem, Oregon, all sawmills and machinery connected therewith, all machinery, tools, implements, apparatus, of every name and description, all live stock, horses, mules, cattle, work oxen, carts, drays, wagons, gearing-tackle, and all leases and all property of every name and nature owned by us, in the possession of Ben Holladay & Co., all of such property being in the state of Oregon, principally in Multnomah and Clackamas counties, the same being the mills, machinery, tools, implements, apparatus, live stock, horses, mules, cattle, carts, drays, wagons, gearing-tackle, railroad ties, iron rail spikes and other railroad materials now and heretofore used by us in the construction of the Oregon Central Railroad Company. It being the intention of this conveyance to transfer to said Oregon Central Railroad Company all property real and personal of every name and nature now owned or possessed by the undersigned in the state of Oregon.

"To have and to hold the said property and every part thereof unto the said Oregon Central Railroad Company, of Salem, Oregon, its successors and assigns, absolutely and forever.

"In witness whereof, we have hereto set our hands and seals this 28th day of March, A. D. 1870.

"[Five-cent United States stamp canceled.]

"Ben Holladay.

"C. Temple Emmet, by Ben Holladay, Atty. in Fact.

"Ben Holladay & Co., by Ben Holladay."

The bill alleged that on March 28, 1870, the land in controversy belonged to Ben Holladay & Co. The answer denied that it was the property of Ben Holladay & Co., and alleged that it was the property of Ben Holladay, and it denied that by the alleged instrument, or otherwise, it was intended to be conveyed to the appellant. Upon the issues and the testimony, the court found that the appellant was not the owner, either legally or equitably, of the land in controversy, and ordered that the bill be dismissed.

· William D. Fenton, Kenneth L. Fenton, Ben C. Dey, and Alfred P. Dobson, all of Portland, Or., for appellant.

Henry Conlin, of San Francisco, Cal., and H. W. Hogue, of Portland, Or., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The appellant relies upon the alleged copy of the instrument of date March 28, 1870, and contends that at the date thereof the property in controversy belonged to Ben Holladay & Co., and that, although it is not described in the copy of that instrument, it was intended to be included therein and conveyed thereby. There is no legal proof, however, that the alleged instrument was ever executed, or that it was ever seen or was in existence or was lost. The evidence offered to prove that there was such an instrument is the minutes of a meeting of the board of directors of the Oregon Central Railroad Company of March 28, 1870, which contain a record of the agreement of cancellation of the construction contract of Ben Holladay & Co., and what purports to be a copy of the instrument which is relied upon, together with certain admissions which are alleged to have been made by Ben Holloday in the answer in the suit of Nightengale & Elliott v. Oregon Central Railroad Company and the Oregon & California Railroad Company, and in an affidavit made by Ben Holladay and filed in that suit, which is referred to in the record as Exhibit 52. We agree with the court below that this evidence is not sufficient to overcome the legal title of record. There is no evidence as to the original of the alleged copy of the instrument which is found in the minutes. It is shown in whose handwriting the copy is made, but it is not shown that the copyist was at any time an officer or employé of the corporation.

[1] While a corporation's books and records are evidence to prove its own acts, they are not competent evidence against third persons to prove contracts with them, in the absence of proof that they knew and assented thereto. Carey v. Williams, 79 Fed. 906, 25 C. C. A. 227; Edwards v. Bates County (C. C.) 117 Fed. 537; Harrison v. Remington Paper Co., 140 Fed. 402, 72 C. C. A. 405, 3 L. R. A. (N. S.) 954, 5 Ann. Cas. 314; Rudd v. Robinson, 126 N. Y. 113, 26 N. E. 1046, 12 L. R. A. 473, 22 Am. St. Rep. 816. In Thompson on Corporations (1st Ed.) § 7740, it is said:

"The general rule is believed to be that, excepting for the purpose of proving what the corporation did, or what action its corporators took in effecting its organization, its books and records are not evidence as against a stranger, or as against a stockholder holding adversely to it."

[2] Nor does the record show that Ben Holladay ever admitted his knowledge of the alleged conveyance. It does appear that his name was affixed to an answer made by the Oregon & California Railroad Company in the Nightengale suit, to which was annexed as an exhibit what purports to be a copy of the instrument which is copied in the minutes. The execution of the instrument, however, was not made an issue in that case. But Holladay did not make the verification to the answer. His name appended thereto appears only as that of the pres-

ident of the corporation. It does not appear whether he signed it, or whether the attorney of the corporation signed for him. There is nothing to show that Holladay ever read the answer or the exhibit attached thereto, or knew that his name was signed thereto. No presumption that he did can arise from the fact that his signature is found subscribed to the answer as an officer of one of the corporations defendant. He was not a party to that suit, and it was not his answer, and, in the absence of proof that he knew and assented to the contents of the answer, nothing contained therein can be properly considered as an admission by him against his individual interest.

[3] In McCaskill Co. v. United States, 216 U. S. 504–514, 30 Sup. Ct. 386, 391 (54 L. Ed. 590), the court said:

"Undoubtedly a corporation is, in law, a person or entity entirely distinct from its stockholders and officers. It may have interest distinct from theirs. Their interests, it may be conceived, may be adverse to its interest, and hence has arisen against the presumption that their knowledge is its knowledge, the counter presumption that, in transactions with it, when their interest is adverse their knowledge will not be attributed to it."

[4] The affidavit of Ben Holladay (complainant's Exhibit 52) which is said to contain an admission of his knowledge of a conveyance of the property may be searched in vain for any statement or suggestion, directly or indirectly, or even remotely, relating to the question of a conveyance of this real estate or the title thereto. It contains no reference whatever to any sale or conveyance of real or personal property from Ben Holladay & Co. to the Oregon Central Railroad Company. Holladay's statements as to the proceedings at the stockholders' meeting of March 28, 1870, and the vote of the stockholders in favor "of said sale and transfer," refer only to the sale and transfer of the franchises and property of the Oregon Central Railroad Company to the Oregon & California Railroad Company. From the fact that Holladay admitted that it was the common judgment of all the stockholders of the Oregon Central Company, its directors, and himself, that the corporate proceedings of March 28 and 29, 1870, were had for the best interests of all concerned in said company, it is not to be inferred that he ratified or affirmed the alleged instrument of March 28, 1870, as a conveyance of, or as expressing an intention to convey, real estate to the Oregon Central Company.

[5] It is contended that the decree of the court below should be reversed on the ground that upon the facts proven the presumption arises that a deed was executed from Ben Holladay or Ben Holladay & Co. to the Oregon Central Railroad Company. The presumption of a deed is not only not suggested by the facts alleged in the bill, but is directly at variance with those facts and with the prayer for relief. The appellant's claim of title, as presented in the bill, is based entirely upon the alleged instrument of date March 28, 1870, which it alleges should in equity be deemed either a deed or an agreement to make a deed, and the prayer is that the same be reformed and specifically enforced, and that the appellee be required to execute a good and sufficient deed of conveyance of the premises in controversy; in other words, the appellant by the allegations of its bill expressly negatives the presumption of a conveyance and rests its claim of title wholly

upon a specified instrument which it says has been lost, but the terms of which it presents to the court as shown by an entry in the minute book of the Oregon Central Railroad Company. The presumption of a conveyance is said to be aided by the proof of two facts: First, the payment of the taxes upon the property by the appellant, and the failure of Ben Holladay or his heirs to pay the same; and, second, those alleged admissions by Ben Holladay of the appellant's title which have already been discussed in this opinion.

[6] To sustain the contention the following authorities are cited: Fletcher v. Fuller, 120 U. S. 534, 7 Sup. Ct. 667, 30 L. Ed. 759; Holtzman v. Douglas, 168 U. S. 278, 18 Sup. Ct. 65, 42 L. Ed. 466; and United States v. Chavez, 175 U. S. 520, 20 Sup. Ct. 159, 44 L. Ed. 255. In Fletcher v. Fuller, the court held that although, as a general rule, it is only where the possession has been actual, open, and exclusive for the period prescribed in the statute of limitations, to bar an action for the recovery of land that the presumption of a deed can be invoked, yet that presumption may properly be invoked where a proprietary right has been exercised beyond such statutory period, although the exclusive possession of the whole property to which the right is asserted may have occasionally been interrupted during such period, if in addition to the actual possession there have been other open acts of ownership. In that case there had been an exclusive working of a quarry on the land for more than 28 years under a claim of title of the whole tract by virtue of conveyances in which it was described, and the parties in possession had paid taxes on the property for a period of 77 years. In Holtzman v. Douglas, there was no question or discussion of a presumption of a conveyance. The defendants relied entirely upon title derived through a tax deed, and continued adverse possession thereunder for more than twenty years. In United States v. Chavez, the proof showed uninterrupted possession of lands in Mexico for more than 100 years prior to the transfer of the territory in which they were situated to the United States, and continuing thereafter until the presentation of a petition to the court of private land claims for a decree confirming the title of the petitioners. It was upon these facts that the court remarked:

"Upon a long and uninterrupted possession, the law bases presumptions as sufficient for legal judgment, in the absence of rebutting circumstances, as formal instruments, or records, or articulate testimony. Not that formal instruments or records are unnecessary, but it will be presumed that they once existed and have been lost."

It is apparent that the facts in those cases differ widely from the facts in the case at bar.

[7] As to the possession of the land in controversy, the court below found that it has never been in the actual possession or occupancy of any person or persons since Holladay & Co. ceased logging operations thereon in 1869. It is admitted that the land has never been cleared or cultivated, and that it was not inclosed until March, 1905. It is true that the complainant has paid taxes on the land since 1873, but in the year 1880 the property was assessed to Ben Holladay, and from 1902 to 1910 it was assessed as the property of Ben Holladay & Co. The mere fact of the payment of these taxes is certainly no ground

on which to presume a conveyance to the taxpayer. The land had been denuded of its timber, and in 1870 it was of little value. There is no evidence of any act of possession, or any assertion of ownership, by the Oregon Central Company or by the appellant, other than the payment of taxes, until after the death of Ben Holladay. The first act of assertion of ownership that is claimed was in 1890, when an agent of the appellant examined the land to ascertain its value. In 1905, the appellant placed a wire fence about it, the explanation of which was that:

"Inasmuch as there was no record title, it would be inadvisable to stir the matter up, and thought we would just fence it, and assert our possession in that way, and I presume to take advantage of the statute of limitations in that case."

The statutes of Oregon assume to declare upon what the presumption of title may be based. It is upon ten years of continuous adverse possession. Under those statutes mere silent possession, no matter how long continued, does not destroy the right of another.

The presumption of a grant had its origin at a time when there was no registration of conveyances, and the muniments of title were subject to loss or destruction. It was indulged upon the theory that long-continued, open, notorious, and adverse possession of property must have had its origin in a conveyance, which had been lost. The best expression of the doctrine is found in Ricard v. Williams, 7 Wheat. 59, 108 (5 L. Ed. 398) where Judge Story said:

"Presumptions of this nature are adopted from the general infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions. They are founded upon the consideration that the facts are such as could not, according to the ordinary course of human affairs, occur, unless there was a transmutation of title to, or an admission of an existing adverse title in, the party in possession. They may therefore be encountered and rebutted by contrary presumptions, and can never fairly arise where all the circumstances are perfectly consistent with the nonexistence of a grant."

With this doctrine for our guidance, we have to inquire whether the elements on which such a presumption is based are to be found in the case at bar. It is to be observed, first, that during the period of the appellant's alleged possession there has been no difficulty in the way of preserving muniments of title; the registration laws having obviated that difficulty. Nor, according to the policy of the present laws of the states, is there a necessity for indulging a presumption to support long and uninterrupted possession; the policy of the law in that respect being definitely expressed in statutes of limitation, and in provisions for the acquisition of title through short periods of adverse possession. These statutes leave little or no room for the indulgence of the presumption of a grant. In Wigmore on Evidence, § 2522, it is said:

"But the systematic extension of the principle of acquisition by limitation, the reduction of the required possession to short periods, and (in the United States) the practice of compulsory registration of deeds of conveyance, have left little scope for the presumption."

[8] Again, all the circumstances in the present case are "perfectly consistent with the nonexistence of a grant," and, in fact, those circum-

stances, instead of supporting the presumption of a deed, tend strongly to rebut it. The alleged copy of the instrument found in the minutes, if it has any probative effect, establishes the fact that no other instrument was executed, and that therefore there was no conveyance. "Where the origin of the claim of title is known, there will be no presumption of a lost grant." Claflin v. Boston & Albany R. R. Co., 157 Mass. 499, 32 N. E. 659, 20 L. R. A. 638. And the presumption cannot arise "where the claim is of such a nature as is at variance with the supposition of a grant." Ricard v. Williams, supra, 7 Wheat. page 108, 5 L. Ed. 398.

[9] There is no legal proof whatever of the execution of the alleged instrument of date March 28, 1870. There is no evidence that the instrument ever was signed or was in the possession of any one, or that it was lost. There is only the bare fact that what purports to be a copy of an instrument is found in the minute books of the Oregon Central Railroad Company. And that copy does not appear to be the copy of a deed, but of a bill of sale of personal property. In the granting part thereof there is enumerated:

"All sawmills and machinery connected therewith, all machinery, tools, implements, apparatus, of every name and description. all live stock, horses, mules, cattle, work oxen, carts, drays, wagons, gearing-tackle, and all leases and all property of every name and nature owned by us, in the possession of Ben Holladay & Co."

Then follows the further specification:

"The same being the mills, machinery, tools, implements, apparatus, live stock, horses, mules, cattle, carts, drays, wagons, gearing-tackle, railroad ties, iron rail spikes, and other railroad materials. now and heretofore used by us in the construction of the Oregon Central Railroad Company."

So far there is no mention or suggestion of any real property. But next there is added, as through inadvertence or afterthought, the words:

"It being the intention of this conveyance to transfer to said Oregon Central Railroad Company all property, real and personal, of every name and nature now owned or possessed by the undersigned in the state of Oregon."

That it was not the intention of the parties to the instrument to convey real property is shown by the form of the instrument itself. If such a paper was executed, it was executed as a bill of sale, for it was not sealed, witnessed, or acknowledged, and it was stamped with the revenue stamp of a bill of sale, and not with the stamp required of a conveyance of real estate. If it was ever delivered, it was treated as a bill of sale, for it was never recorded; no recording of a bill of sale being necessary under the registration laws of Oregon. Now, this very copy of an instrument, which is not a copy of a deed nor of an agreement to make a deed, is referred to to support the presumption that there was another instrument, and that that other instrument was a deed, and this in the face of the evident fact and the distinct allegation of the bill that the appellant's claim of title had its origin in the very instrument of which the minute book contains the alleged copy. We find no ground on which to sustain such

a presumption and no ground for reversal of the decree of the court below.

The decree is affirmed.

ROSS, Circuit Judge (dissenting).  On the 24th of April, 1911, the complainant filed in the court below its bill of complaint, which, after the trial of the cause, was dismissed.  In the bill it was alleged, among other things, that on the 13th of the preceding March, the defendant to the bill commenced an action at law in the same court against the complainant as defendant to recover the possession of the north half of the northeast quarter of section 32, and the east half of the southeast quarter and lots 5 and 6 of section 29 in township 1 south, range 2 east, of the Willamette meridian, in Clackamas county, Or., with alleged damages, rents, issues, and profits, to restrain the prosecution of which law action the bill was brought, as also to establish by the decree of the court title to the property in the complainant and to enjoin the defendant to the bill from ever asserting any title thereto.

The facts out of which the litigation grows occurred more than 40 years ago; the bill alleging that in 1867 an Oregon corporation called Oregon Central Railroad Company, having its principal office at Salem in that state, for the purpose of building and operating a railroad from Portland southward to the California line, entered into certain contracts for the construction of a portion of the road with one A. J. Cook and A. J. Cook & Co., which contracts subsequently passed by assignment to the firm of Ben Holladay & Co.; that in the carrying out of those contracts by Holladay & Co. that firm first purchased the timber on the tracts of land mentioned, and thereafter, to wit, in the year 1869, acquired the title to the lands by deeds which were duly recorded in the recorder's office of the county in which they are situate; that on the 28th day of March, 1870, the said firm of Ben Holladay & Co. made a settlement with the Oregon Central Railroad Company of and concerning the performance of the said contracts and all matters in relation thereto; and that on that day those parties made and entered into this written agreement:

"Know all men by these presents: That we, the undersigned, Ben Holladay & Co., of Portland, Oregon, in consideration of the cancellation this date by the Oregon Central Railroad Company, at Salem, Oregon, of all certain contracts in writing heretofore existing between said company and the undersigned, in relation to the construction of a railroad and telegraph line from Portland, Oregon, through the Willamette, Umpqua and Rogue River valleys to the California line, and the agreement of such company to pay the undersigned for all moneys paid out, expended and incurred under such contracts, to wit, an amount not less than eight hundred thousand dollars in United States gold coin.  It being a part of the arrangement that all the property hereinafter specified should be transferred and delivered to said company, and in consideration of the full sum of one dollar to us in hand paid, the receipt whereof is hereby acknowledged, have sold, assigned, set over, transferred, delivered and conveyed, and by these presents we, Ben Holladay & Co., do sell, assign, transfer, set over, deliver and convey unto said Oregon Central Railroad Company, of Salem, Oregon, all sawmills and machinery connected therewith, all machinery, tools, implements, apparatus of every name and description, all live stock, horses, mules, cattle, work oxen, carts, drays, wagons, gearing-tackle, and all leases and all property of every name and nature now owned by us, in the possession of Ben Holladay & Co., all of such prop-

erty being in the state of Oregon, principally in Multnomah and Clackamas counties, and same being the mills, machinery, tools, implements, apparatus, live stock, horses, mules, cattle. carts, drays, wagons, gearing-tackle, railroad ties, iron rail spikes and other railroad materials now and heretofore used by us in the construction of the Oregon Central Railroad Company. It being the intention of this conveyance to transfer to said Oregon Central Railroad Company all property real and personal of every name and nature now owned or possessed by the undersigned in the state of Oregon.

"To have and to hold the said property and every part thereof unto the said Oregon Central Railroad Company, of Salem, Oregon, its successors and assigns, absolutely·and forever.

"In witness whereof, we have hereto set our hands and seals this 28th day of March, A. D. 1870.

"[Five-cent United States stamp canceled.]
          "Ben Holladay.                                        ·
          "C. Temple Emmet, by Ben Holladay, Atty. in Fact.
          "Ben Holladay & Co., by Ben Holladay."

That alleged instrument is the real basis of the present suit, but ·was, according to the averments of the bill, lost, mislaid, or destroyed. The bill further alleges that on the same day, to wit, March 28, 1870, the Oregon Central Railroad Company entered into the possession of all the property described in the instrument above set out, including the lands described in the bill, and that on the next day, to wit, March 29, 1870, the Oregon Central Railroad Company, for a valuable consideration conveyed to the complainant the same property, including the said lands, which latter conveyance was duly recorded April 18, 1870, in the records of Clackamas county, and that thereafter and on the same day, to wit, March 29, 1870, the complainant entered into the exclusive possession of the said lands and has so remained ever since. The bill also alleges that the Oregon & California Railroad Company subsequently paid the taxes assessed against the said lands. The bill alleges various other matters (the most ·important of which will be hereinafter referred to) intended to prove the execution and delivery of the instrument of March 28, 1870, above set out in full, and intended to prove that the said instrument was intended by the parties thereto as a conveyance of the lands here in controversy and specifically described in the bill, as well as the other property therein described, to the Oregon Central Railroad Company. The bill also alleges in substance that neither the firm of Ben Holladay & Co. nor the said Ben Holladay ever claimed any interest in the lands in controversy at any time after the making of the alleged instrument of March 28, 1870; that the said Holladay died testate in Multnomah county, Or., on or about July 8, 1887, leaving various heirs, and among others the defendant to the present bill, Maria de Grubissich, née Maria de Pourtales, who as residuary legatee now claims to be the owner of the lands in question; that the said will was admitted to probate in the proper probate court; and that neither in the will nor in any of the probate proceedings was any claim made on behalf of Holladay or on the part of his estate to the lands in question.

The defendant by her answer denied, among other things, the execution or delivery of the said instrument of March 28, 1870, and denied that any such instrument ever existed. She also denied that the Oregon Central Railroad Company was ever the owner of the lands in

question or was ever in possession of any part thereof, or ever at any time conveyed or agreed or intended to convey any portion thereof or any right therein to the Oregon & California Railroad Company, and denied that the latter company ever at any time entered into the possession of any portion of the said lands, or did any act or thing adverse to the title and possession and right of possession thereto of the defendant and her predecessors in interest, and alleged that the only improvement of any kind made upon the lands by any person or corporation was a wire fence constructed around the premises in March, 1905, which the defendant alleged upon information and belief was constructed by a corporation called Oregon & California Land Company, for the sole purpose of "attempting to seize and hold actual possession of said land continuously for ten years and to thereby obtain title thereto by adverse possession as against this defendant." The defendant in her answer also set up that whatever taxes were paid by the Oregon & California Railroad Company upon the property in question were paid voluntarily and without right or obligation on its part.

Taking the case as made by the bill, it is clear that if the complainant is entitled to prevail in this suit it must be by virtue of the alleged lost instrument of March 28, 1870, considered as a conveyance of the lands described in the bill or as creating such an equity as entitled the complainant's grantor to a conveyance of the legal title thereto.

It is conceded by the counsel for the appellant that there is no direct evidence of the execution or delivery of the document of March 28, 1870, or even any direct evidence that it ever existed; but, in order to prove that such was the fact, the complainant offered, among other things, certain entries in the minute book of the Oregon Central Railroad Company, which entries are too voluminous to be here set out in full, but which show the cancellation of the construction contracts held by Holladay & Co. and a purported copy of the alleged instrument hereinbefore set out as the basis of the present suit, and also certain subsequent agreements between the Oregon Central Railroad Company and the complainant company, culminating in a conveyance by the Oregon Central Railroad Company to the complainant of whatever property, if any, it acquired from Holladay & Co. The court below held that the entries in the minutes of the Oregon Central Railroad Company were not proof of the execution or existence of a conveyance from Holladay & Co. to the Oregon Central Railroad Company of the lands in question; but I am of the opinion that the true solution of the case does not depend upon that question. The real question, as I view it, is whether, in view of all of the evidence, the execution of such conveyance is not to be presumed. In addition to the facts already referred to, the evidence shows that upon the execution of the conveyance from the Oregon Central Railroad Company to the complainant in March, 1870, the latter company followed up the constructive possession that passed with the deed by such acts of actual possession as the nature of the lands, which were wild, uncultivated, wooded, and brush lands, required; that it caused its agents to look after the lands, and from time to time sold cordwood and gravel

therefrom, and, in the year 1905, caused a wire fence to be built around them; and that every year since 1873 it has paid the taxes on the lands, although in the year 1880 they were assessed to Ben Holladay, and from 1902 to 1910 were assessed in the name of Ben Holladay & Co.

It thus appears from the evidence that for more than 40 years the complainant has claimed the property in question under the proceedings above indicated, asserting the acts of ownership thereof that have been mentioned, and that during the same long period the appellee, defendant below, asserted no claim of any character to the property until the bringing of her action of ejectment in 1911, nor did Holladay, through whom she claims, nor the firm of Holladay & Co., in which, according to the evidence, he was the principal owner. On the contrary, the evidence discloses a number of instances in which Holladay expressly admitted his knowledge of the alleged lost conveyance, once under oath by affidavit made by him on the 22d day of June, 1871, in a suit brought by John Nightengale and Simon G. Elliott against the Oregon Central Railroad Company et al., in the United States Circuit Court for the District of Oregon, and in the answer filed by the Oregon Central Railroad Company in that suit, signed by Holladay as president of the company, and to which answer was annexed as an exhibit a purported copy of the alleged lost instrument. Moreover, after the death of Holladay, at no time during the administration of his estate was any claim made by the representatives of his estate or by any of his heirs or devisees to any portion of the lands in question. So that we have here a case where for more than 40 years the complainant has claimed ownership of the lands now in dispute, under a deed executed to it by the Oregon Central Railroad Company pursuant to an asserted written conveyance to it from the true owner, a purported copy of which was admitted as genuine by one of the grantors under oath nearly 40 years before the commencement of the present litigation. Under such circumstances the execution of the alleged original lost conveyance may, in my opinion, be well presumed.

In the case of Fletcher v. Fuller, 120 U. S. 534, 7 Sup. Ct. 667, 30 L. Ed. 759, the trial court charged the jury in effect that in order to presume a lost deed the jury must be satisfied that such a deed had in fact actually existed. In holding the instruction erroneous the Supreme Court said, among other things:

"In such cases, 'presumptions,' as said by Sir William Grant, 'do not always proceed on a belief that the thing presumed has actually taken place. Grants are frequently presumed, as Lord Mansfield says (Eldridge v. Knott, Cowp. 215), merely for the purpose, and from a principle of quieting the possession. There is as much occasion for presuming conveyances of legal estates; as otherwise titles must forever remain imperfect, and in many respects unavailable; when from length of time it has become impossible to discover in whom the legal estate (if outstanding) is actually vested.' Hillary v. Waller, 12 Ves. 239, 252.

"The owners of property, especially if it be valuable and available, do not often allow it to remain in the quiet and unquestioned possession of others. Such a course is not in accordance with the ordinary conduct of men. When, therefore, possession and use are long continued, they create a presumption of lawful origin; that is, that they are founded upon such instruments and proceedings as in law would pass the right to the possession and use of the

property. It may be, in point of fact, that permission to occupy and use was given orally, or upon a contract of sale, with promise of a future conveyance, which parties have subsequently neglected to obtain, or the conveyance executed may not have been acknowledged, so as to be recorded, or may have been mislaid or lost. Many circumstances may prevent the execution of a deed of conveyance, to which the occupant of land is entitled, or may lead to its loss after being executed. It is a matter of almost daily experience that reconveyances of property, transferred by the owners upon conditions or trusts, are often delayed after the conditions are performed or the trusts discharged, simply because of the pressure of other engagements, and a conviction that they can be readily obtained at any time.

"The death of parties may leave in the hands of executors or heirs papers constituting muniments of title, of the value of which the latter may have no knowledge, and therefore for the preservation and record of which may take no action: and thus the documents may be deposited in places exposed to decay and destruction. Should they be lost, witnesses of their execution, or of contracts for their execution, may not be readily found, or, if found, time may have so impaired their recollection of the transactions that they can only be imperfectly recalled, and of course imperfectly stated. The law, in tenderness to the infirmities of human nature, steps in and by reasonable presumptions, that acts to protect one's rights, which might have been done, and in the ordinary course of things generally would be done, have been done in the particular case under consideration, affords the necessary protection against possible failure to obtain or to preserve the proper muniments of title, and avoids the necessity of relying upon the fallible memory of witnesses, when time may have dimmed their recollection of past transactions; and thus gives peace and quiet to long and uninterrupted possessions.

"The rule of presumption, in such cases, as had been well said, is one of policy, as well as of convenience, and necessary for the peace and security of society. 'Where one uses an easement whenever he sees fit, without asking leave and without objection,' says the Supreme Court of Pennsylvania, 'it is adverse, and an (un) interrupted adverse enjoyment for 21 years is a title which cannot afterward be disputed. Such enjoyment, without evidence to explain how it began, is presumed to have been in pursuance of a full and unqualified grant.' Garrett v. Jackson, 20 Pa. 331, 335. The same presumption will arise whether the grant relate to corporeal or incorporeal hereditaments. As said by this court in Ricard v. Williams, 7 Wheat. 59, 119 [5 L. Ed. 398], speaking by Mr. Justice Story: 'A grant of land may as well be presumed as a grant of a fishery, or of common, or of a way. Presumptions of this nature are adopted from the general infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions. They are founded upon the consideration that the facts are such as could not, according to the ordinary course of human affairs, occur, unless there was a transmutation of title to, or an admission of an existing adverse title in, the party in possession.'

"It is not necessary, therefore, in the cases mentioned, for the jury, in order to presume a conveyance, to believe that a conveyance was in point of fact executed. It is sufficient if the evidence leads to the conclusion that the conveyance might have been executed and that its existence would be a solution of the difficulties arising from its nonexecution."

In the same case the Supreme Court approved the rulings in the cases of Casey's Lessee v. Inloes, 1 Gill (Md.) 430, 503, 39 Am. Dec. 658, and Williams v. Donell, 2 Head (Tenn.) 695, 697, in the former of which cases the Court of Appeals of Maryland held that, where there had been a continuous possession of land for 20 years or upwards by a party or persons claiming under him, the court was authorized to instruct the jury, in the absence of a deed to such party, to presume that one had been executed to him. It also approved the refusal of the court below to instruct the jury that before they could find a title in the defendants, or any one of them, by presumption of a

grant by the plaintiff or those under whom he claims, they must believe on their consciences and find as a fact that such grant was actually made; and in the latter case the Supreme Court of Tennessee, speaking on the same point, said:

"It is not indispensable, in order to lay a proper foundation for the legal presumption of a grant, to establish the probability of the fact that, in reality, a grant ever issued. It will afford a sufficient ground for the presumption, to show that, by legal possibility, a grant might have issued. And this appearing, it may be assumed—in the absence of circumstances repelling such conclusion—that all that might lawfully have been done to perfect the legal title was in fact done, and in the form prescribed by law."

In line with the foregoing are the decisions of the Supreme Court in the cases of United States v. Chavez, 175 U. S. 520, 20 Sup. Ct. 159, 44 L. Ed. 255, and Holtzman v. Douglas, 168 U. S. 284, 18 Sup. Ct. 67, 42 L. Ed. 466, in which latter case the court said:

"Payment of the taxes, as described in the above statement of facts, is very important and strong evidence of a claim of title; and the failure of the plaintiffs' predecessors to make any claim to the lot or to pay the taxes themselves is some evidence of an abandonment of any right in or claim to the property. In Ewing v. Burnet, 11 Pet. 41 [9 L. Ed. 624], it was held by this court that the payment of taxes on land for 24 successive years by the party in possession was powerful evidence of the claim of right to the whole lot upon which the taxes were paid."

The doctrine of the foregoing cases applied to the record in the present case requires, in my opinion, a reversal of the judgment appealed from, and I therefore think the judgment should be reversed, and the cause remanded to the court below, with directions to enter judgment for the complainant, with costs.